[Cite as *State v. Dunn*, 2017-Ohio-518.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
JACKSON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 15CA1 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| ZACHARY DUNN, | : | |
| | : | |
| Defendant-Appellant. | : | **Released: 02/03/17** |

_____
APPEARANCES:

Timothy P. Young, Ohio State Public Defender, and Valerie Kunze,
Assistant State Public Defender, Columbus, Ohio, for Appellant.

Justin Lovett, Jackson County Prosecuting Attorney, Jackson, Ohio, for
Appellee.
_____

McFarland, J.

{¶1} Zachary Dunn appeals his convictions and sentence in the

Jackson County Court of Common Pleas after a jury found him guilty of

three counts of kidnapping, one count of abduction, one count of rape, two

counts of gross sexual imposition, and one count of felonious assault.

Appellant submits his convictions were not supported by sufficient evidence,

and also were against the manifest weight of the evidence. He also argues

the trial court erred when it failed to merge convictions for gross sexual

imposition with rape and convictions for kidnapping with abduction. Upon

review, we find no merit to Appellant's arguments. The trial court did not

err. Accordingly, we overrule Appellant's assignments of error and affirm

the judgment of the trial court.

FACTS

**{¶2}** On September 26, 2013, Zachary Dunn was indicted by the

Jackson County Grand Jury as to the following counts:

| | |
|---|---|
| Counts One, Two, and Three: | Kidnapping, in violation of R.C. 2905.01(A)(2)/(A)(3) and (A)(4); |
| Counts Four and Five: | Abduction, in violation of R.C. 2905.02(A)(1)/(A)(2); |
| Count Six: | Rape, in violation of R.C. 2907.02(A)(1)(b); |
| Counts Seven and Eight: | Gross Sexual Imposition, in violation of R.C. 2907.05(A)(4)/(B); and, |
| Count Nine: | Felonious Assault, in violation of R.C. 2903.11(A). |

**{¶3}** Appellant's indictment stemmed from events which occurred on

July 26, 2013 in Jackson County, Ohio. On that date, M.S., a six-year-old

child, was reported missing from her home at 2:10 a.m.[1] An Amber Alert

was issued and authorities searched neighborhoods, creeks, and fields.

---

[1] Stephen Moore, who worked as dispatcher for the City of Jackson, testified that the report of M.S.'s disappearance was called in by her father at 2:10 a.m., and he indicated M.S. disappeared between 1:30 and 1:40 a.m. Some family members and neighbors initially undertook searching for her in her own neighborhood. After they were unsuccessful and the matter was reported, a full-scale search began.

Fortunately, M.S. was discovered alive at 4:00 p.m. the same day at a residence near Landrum Cemetery on Oakland Road in rural Jackson County. However, she had been beaten, raped, and abandoned in a dark wooded area.

{¶4} In this case, Appellant had been at M.S.'s home twice and just hours before her disappearance. Appellant lived on S.R. 776 in Jackson County with his girlfriend, Alisa Yates, and her three young daughters.[2] On the night of M.S.'s disappearance, Franklin Stewart Sr. ("Frank Sr."), M.S.'s father, left M.S. in the care of Austin Coon ("Austin"), a teenage boy who was a friend of the family. After M.S. disappeared, Austin reported that Appellant had stopped by the home a second time, around 1:30-1:35 a.m.

{¶5} Austin advised that Appellant was wearing a brown or tan Carhart jacket and that he drove away in a dark-colored Chevy Cavalier. Appellant was later observed on surveillance footage in a convenience store in the area buying beer at 12:37 a.m., prior to his second visit to the Stewart residence. In the surveillance footage, Appellant is viewed wearing a green Carhart jacket.

{¶6} Officers were dispatched to Appellant's residence at 3:20 a.m.

---

[2] When these events occurred, Yates was pregnant with Appellant's child.

on July 26th, where they found Appellant and Alisa Yates. Appellant advised he had been home all evening. Alisa Yates also indicated, to her knowledge, Appellant had been home in bed all evening. However, a trooper assisting in the investigation discovered that a green Chevy Cavalier parked at the residence was warm and the seat had been pushed back. Yates verified she owned the green Chevy Cavalier and that Appellant owned a green Carhart coat.

{¶7} Also, at 9:31 a.m. on July 26th, a green Carhart jacket was discovered in Landrum Cemetery on the ground. BCI personnel, who later tested the jacket, discovered the presence of M.S.'s DNA. Although M.S. did not describe the place where she was assaulted as a cemetery, she later testified that there were lots of trees and it was dark. The residence where M.S. was located was approximately one-half mile from the cemetery.

{¶8} At the time she was taken, M.S. resided with her estranged parents, Frank Sr. and Brenda. Brenda was in jail in another county on the night of M.S.'s disappearance. The Stewarts have five other children: Franklin Stewart, Jr. ("Frank Jr."), age 22; Tyler, age 21; Tiashawnia,[3] age 19; N.S., age 15; and S.S., age 9. Several law enforcement officers who

---

[3] Tyler and Tiashawnia were not living in the home at the time M.S. was kidnapped.

testified indicated they were familiar with M.S. and the Stewart home as a result of previous calls to the residence.[4]

{¶9} On September 27, 2013, Appellant was arraigned and entered pleas of not guilty to all charges. The trial court set bond at $500,000.00 cash or surety and scheduled pretrial hearings and a trial date. Eventually, Appellant proceeded to a jury trial which took place between March 16, 2015 and April 1, 2015. Various media outlets followed the case from its inception through the trial.

{¶10} The State of Ohio presented testimony from various witnesses which included M.S., her father, Austin Coon, the teenagers who found M.S., local law enforcement who investigated her disappearance, medical professionals who treated her, agents and scientists from the Ohio Bureau of Criminal Identification and Investigation (BCI), Alisa Yates, and others. The jury was taken on a view of the scenes of M.S.'s home, Appellant's home, and Landrum Cemetery. The State and the defense introduced numerous exhibits.[5]

---

[4] Jackson County Sheriff Tedd Frazier testified he knew M.S. and was familiar with the Stewart residence as he had responded there on reports of drunk and disorderly conduct, domestic violence, and possession of narcotics. Investigator Michael Music and Sgt. Scott Conley, both of the Jackson Police Department, were also familiar with M.S. and the Stewart residence.

[5] The date of the incident and the venue were not disputed. That M.S. was under the age of 13 years old at the time was not disputed. Appellant has not challenged the authenticity or the chain of custody of the exhibits nor the designation of expert witnesses.

{¶11} On April 1, 2015, the jury rendered guilty verdicts on eight counts.[6] The parties were given additional time to file sentencing briefs. Sentencing was held on May 27, 2015 and June 11, 2015.[7] M.S.'s parents addressed the court. Appellant was sentenced to consecutive terms of life imprisonment on kidnapping (Count 3), and life without parole on rape (Count 6). He received prison terms of 36 months for abduction, 60 months for gross sexual imposition (Count 7)[8], and eight years for felonious assault (Count 9).

{¶12} This timely appeal followed. Additional facts and the testimony of various witnesses will be summarized below.

ASSIGNMENTS OF ERROR

"I. ZACHARY DUNN'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF ZACH'S RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

"II. ZACHARY DUNN'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF ZACH'S RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES

---

[6] Appellant was found not guilty of abduction, Count 4. Counts 1, 2, and 3 contained Sexually Violent Predator specifications. On April 20, 2015, the State moved to dismiss those specifications. On April 22, 2015, the trial court granted the State's motion.

[7] The State conceded that the kidnapping counts merged for purposes of sentencing.

[8] Although not explicitly set forth, it appears the gross sexual imposition counts were also merged for purposes of sentencing.

CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE
OHIO CONSTITUTION."

A.  STANDARD OF REVIEW

{¶13}  A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law. *Wickersham* at 22; *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins,* syllabus.  The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781 (1979); *State v. Jenks,* 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991).  Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins,* 78 Ohio St.3d at 390 (Cook, J., concurring).

{¶14}  Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the

prosecution. *Wickersham, supra,* at 23; *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶15} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Wickersham, supra,* at 24, quoting *Thompkins,* 78 Ohio St.3d at 387. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " *Wickersham, supra,* at 24, quoting *Eastley v. Volkman,* 132 Ohio St.3d 328,

2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *Thompkins,* 78 Ohio St.3d

at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990).

{**¶16**} When an appellate court considers a claim that a conviction is

against the manifest weight of the evidence, the court must dutifully

examine the entire record, weigh the evidence, and consider the credibility

of witnesses. The reviewing court must bear in mind, however, that

credibility generally is an issue for the trier of fact to resolve. *Wickersham,*

*supra,* at 25; *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001);

*State v. Murphy,* 4th Dist. Ross No. 07CA2953, 2008-Ohio-1744, ¶ 31.

" 'Because the trier of fact sees and hears the witnesses and is particularly

competent to decide "whether, and to what extent, to credit the testimony of

particular witnesses," we must afford substantial deference to its

determinations of credibility.' " *Barberton v. Jenney,* 126 Ohio St.3d 5,

2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, quoting *State v. Konya,* 2nd Dist.

Montgomery No. 21434, 2006-Ohio-6312, ¶ 6, quoting *State v. Lawson,* 2nd

Dist. Montgomery No. 16288 (Aug. 22, 1997). As the Eastley court

explained:

> " '[I]n determining whether the judgment below is manifestly
> against the weight of the evidence, every reasonable intendment
> must be made in favor of the judgment and the finding of facts.
>
> * * *

> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer,* 4th Dist. Pickaway No. 11CA9, 2012-Ohio-1282,¶ 24; *accord State v. Howard,* 4th Dist. Ross No. 07CA2948, 2007-Ohio-6331, ¶ 6 ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").

{¶17} Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered .' " *Wickersham, supra,* at 26, quoting *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court should find a conviction against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.,* quoting

*Martin*, 20 Ohio App.3d at 175; *State v. Lindsey*, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

**{¶18}** When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction. *Wickersham, supra,* at 27; *State v. Pollitt*, 4th Dist. Scioto No. 08CA3263, 2010-Ohio-2556, ¶ 15. " 'Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *State v. Lombardi,* 9th Dist. Summit No. 22435, 2005-Ohio-4942, ¶ 9, quoting *State v. Roberts*, 9th Dist. Lorain No. 96CA006462 (Sept. 17, 1997).

**{¶19}** Here, we first consider Appellant's argument that his conviction is against the manifest weight of the evidence. Having reviewed the entire record, weighed the evidence, and considered the credibility of the witnesses presented at Appellant's trial, we find Appellant's convictions on 8 of the 9 counts are not against the manifest weight of the evidence.

## B. LEGAL ANALYSIS

**{¶20}** The kidnapping statute, R.C. 2905.01, provides in pertinent part as follows:

> "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen * * * by any means, shall

remove another from the place where the other person is found
or restrain the liberty of the other person, for any of the
following purposes:
* * *
(2) To facilitate the commission of any felony or flight
thereafter;
(3) To terrorize, or to inflict serious physical harm on the victim
or another;[9]
(4) To engage in sexual activity, as defined in section 2907.01
of the Revised Code, with the victim against the victim's will
* * *."[10]

{¶21} The abduction statute, R.C. 2905.02(A)(2), provides as

follows:

"(A) No person, without privilege to do so, shall knowingly do
any of the following:
* * *
(2) By force or threat, restrain the liberty of another person
under circumstances that create a risk of physical harm to the
victim or place the other person in fear * * *."

{¶22} The rape statute, R.C. 2907.02, provides in pertinent part:

"(A)
(1) No person shall engage in sexual conduct with another who
is not the spouse of the offender * * * when any of the
following applies:
* * *
(b) The other person is less than thirteen years of age, whether
or not the offender knows the age of the other person."

{¶23} Gross sexual imposition, as defined by R.C. 2907.05, provides

in relevant part:

---

[9] The trial court defined "serious physical harm" in the jury instructions.
[10] The trial court also provided the definitions of "sexual activity," "sexual conduct," and "sexual contact," in the instructions.

"(A) No person shall have sexual contact with another, not the spouse of the offender * * * when any of the following applies: * * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person. * * *

(B) No person shall knowingly touch the genitalia of another, when the touching is not through clothing, the other person is less than twelve years of age, whether or not the offender knows the age of that person, and the touching is done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."

**{¶24}** And, Count 9, felonious assault, R.C. 2903.11(A)(1) provides that "[N]o person shall knowingly * * * cause serious physical harm to another * * *."

**{¶25}** As indicated above, we find competent credible evidence supports the jury's determination that Appellant was the person who removed M.S. from her home, restrained her liberty, and committed the indicted felonies. While much of the evidence is circumstantial, "[D]irect evidence of a fact is not required. Circumstantial evidence * * * may also be more certain, satisfying, and persuasive than direct evidence." *State v. Grube,* 2013-Ohio-692, 987 N.E.2d 287 (4th Dist.), ¶ 30, quoting *State v. Lott,* 51 Ohio St.3d 160, 555 N.E.2d 293 (1990), citing *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 10, (1960), citing *Rogers v. Missouri Pacific RR Co,* 352 U.S. 500-508, fn. 17, 77 S.Ct. 443,

449, fn. 17, (1957). Even murder convictions and death sentences can rest solely on circumstantial evidence. *Grube, supra*, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987); *State v. Nicely,* 39 Ohio St.3d 147, 151, 529 N.E.2d 1236, 1239 (1988). We begin by setting forth the pertinent portions of testimony and other relevant evidence.

1.  Austin Coon

{¶26} Austin testified on July 25, 2013, Frank Sr. called Austin and asked him to babysit. Austin agreed and went to the Stewart house before dark.[11] Austin testified he thought of M.S. as a "little sister," and he babysat M.S. and S.S. when their parents went "out to the bars." Appellant stopped by and asked if Frank Sr. had a CD player for sale. Austin did not know Appellant at that time. When Appellant left, Frank Sr. gave him Appellant's name.

{¶27} Later, Frank Sr., Frank Jr., and N.S. left to go to get air in a tire at Mike's One Stop. Austin was alone with M.S. and S.S. Austin testified they were in Brenda's room.[12] M.S. was on the computer playing games and Austin was using his cell phone to access Facebook. S.S. was asleep on the couch in the living room. Austin testified Appellant knocked on the door and asked for Frank Sr. Austin let him inside to wait. Austin went back to

---

[11] In a second written statement given to police, Austin gave 11:45 p.m. as his arrival time.
[12] The evidence indicates "Brenda's room" was the parents' bedroom.

the bedroom and Appellant followed him.  Austin recalled Appellant was wearing a brown or tan Carhart jacket.

{¶28}  Approximately 5 minutes later, Appellant said he was going to his brother's house to get cigarettes.  Appellant walked onto the porch and M.S. ran outside.  Austin repeatedly told her to go back in, but she did not obey.  Appellant said he would "bring her back inside."  Austin went inside briefly to the kitchen to get a drink.  When he came back from the kitchen, M.S. was gone.  He looked outside and saw a dark green or dark blue Chevy Cavalier with tinted windows pulling away.  Austin testified Appellant was first at the residence around midnight.  The second time Appellant was there, when M.S. disappeared, was around 1:30-1:35 a.m.

{¶29}  Austin began calling for M.S. and looking for her outside the house.  Frank Sr. and the others returned soon after.  When Austin informed Frank Sr. that M.S. was gone, they began looking for her in the surrounding area.  When they could not find her, Frank Sr. called the police.

{¶30}  Austin was eventually taken to the police station where he wrote two statements which he identified for the jury.  He testified the short statement, his first one, was false.  He also admitted that he was unable to identify Appellant both in a photo array and during a chance encounter at the

police station.  Austin testified he was nervous at the police station and not paying close attention.

{¶31}  However, Austin identified Appellant at trial as the individual who was at the Stewart residence on July 26, 2013.  Austin testified when he last saw M.S. on July 26th, she did not have injuries to her face or body.  Austin was shown various photographs of M.S.'s injuries and denied that she had any injuries before she was taken.

2. Franklin Stewart Sr.

{¶32}  Frank Sr. testified that when M.S. disappeared, he was the sole caretaker for the minor children.  Austin stayed at his house several nights a week and he trusted Austin with the younger children.  Austin treated them like they were his little siblings.  Frank Sr. knew Appellant from selling and trading goods.  He also knew Appellant used pain pills.

{¶33}  On July 25th, Appellant came to the Stewart residence looking for a CD player.  Frank Sr. gave him one and told him to bring the money back later.  Then on July 26th, around 12:30 a.m., Michael Denney, his son's friend, came to the house, advising that Frank Jr. had a flat tire.  Before leaving to assist with the tire, he asked Austin to watch the younger children.  M.S. was in the living room watching TV.  She was wearing a black

swimsuit with a flower on it.[13]  Frank Sr. was gone approximately one hour. When he left, M.S. had no injuries.[14]

{¶34}  When Frank Sr. returned from the convenience store, Austin acted scared and nervous, and said that he couldn't find M.S.  After they searched the house, the basement, and the neighborhood for approximately 30 minutes, Frank Sr. called the police.  He told them he thought Appellant had taken M.S.  Frank Sr. denied telling Austin to lie to the police.

{¶35}  Frank Sr. testified Austin told him the "guy that bought the radio earlier" had returned and asked to use the phone.  When Austin went to get the phone, Appellant was gone and M.S. was missing.  Frank Sr. also identified Appellant in the courtroom.

3.  Michael Denney

{¶36}  Denney, a friend of Frank Jr.'s, testified on July 25, 2013, he and Frank Jr. had been in jail.  They were released around 11:00 p.m. and walked to the Stewart residence.  When they arrived, Frank Sr. and Appellant were on the porch talking.  When Appellant left, he got into a

---

[13] Another witness, Cassie Martin, testified that M.S. had been swimming at her house on July 25, 2013.
[14] On cross-examination, Frank Sr. clarified he fixed a tire at the house earlier in the day and then fixed another one later that day at Mike's One Stop.

dark-colored Chevy Cavalier. Later he and the Stewarts went to Bud's One Stop to fix a tire.[15] [16]

4. Eric Dunn

{¶37} Eric Dunn is Appellant's brother. After authorities learned that Appellant had been to the home just before M.S. disappeared, Sgt. Scott Conley went to Eric Dunn's residence and inquired as to when he had last seen his brother. Dunn testified Appellant had stopped by around 12:30 a.m. wanting to get beer. He was driving a green Cavalier. Dunn provided Appellant's address.

5. The Investigating Officers

{¶38} Sgt. Conley and Investigator Mike Music went to Eric Dunn's house. Conley testified Eric Dunn confirmed to them that Appellant had stopped by between 12:00 and 12:30 a.m. wanting to get beer. Dunn also advised Appellant mentioned getting a CD player from Frank Stewart. Conley next went to the closest gas station/convenience store in the area, "The Filling Station," and requested surveillance video.

{¶39} Sgt. Conley and Trooper Shaner were also dispatched to Appellant's residence to question him. Appellant repeatedly denied to

---

[15] The name of the store where the parties went to change the flat tire was recalled as Mike's One Stop or Bud's One Stop.

[16] On cross-examination, Denney's credibility was challenged as to his recollection about Appellant's leaving and getting into a car, as well as his criminal background. However, he had acknowledged on direct examination that he was on felony probation for possession of heroin.

Conley that he had left during the evening, even upon being advised that three people had placed him in town earlier. Conley observed that Appellant is six feet three inches tall while Alisa Yates, his girlfriend, is five feet four inches tall.

{¶40} Trooper Shaner testified he investigated the Chevy Cavalier at Appellant's residence, noted the windows were "fogged up" and the car felt warm underneath in the fender well. He also noted the driver's seat was a significant distance away from the steering wheel.[17] During his testimony, Sgt. Conley explained the significance of the findings on the Chevy Cavalier. He testified the seat being pushed back and the engine being warm indicated the car had been driven previously.

{¶41} Patrolman Sprague testified on July 29th he was dispatched to Landrum Cemetery with his K9, Ze, a tracking dog. He did not find evidence but Ze circled an area where the grass was flattened. Investigator Music was also investigating the cemetery on July 29th and recalled that the K9 was circling in the area where the employees found the green jacket.

{¶42} Conley further testified on July 30th, he obtained the surveillance video from The Filling Station which showed Appellant entering the store between 12:30 and 12:35 a.m. on July 26th. Appellant

---

[17] Trooper Shaner's testimony was also corroborated by another officer, Sgt. Keith Copas of the Jackson County Sheriff's Office, who assisted at the 776 address.

was wearing a green Carhart coat. While Conley was watching the surveillance video at the store, they received a call that the Liberty Township trustees had located a green Carhart jacket at Oakland Cemetery on July 26th. Conley immediately went to the cemetery, met with the trustees, and obtained the jacket, which resembled the one Appellant was wearing in the video footage. The jacket was bagged, sealed, and sent to BCI. Conley identified the video footage of Appellant and identified the green jacket for the jury.

{¶43} Investigator Music's testimony mirrored Sgt. Conley's in many respects. He recalled Eric Dunn advising that Appellant drove the Chevy Cavalier to his house.

6. Alisa Yates

{¶44} Alisa Yates testified she had dated Appellant for 3 years and they lived together. On July 25th, Yates returned home from her job at Pizza Hut around 10:00 p.m. and Appellant was there, watching TV and drinking beer. Her children were asleep.

{¶45} Yates went to bed around 11:00 p.m. and around 3:00 a.m. police were knocking at her door. Appellant was in bed beside her. She opened the door and they questioned Appellant. Yates told the officers she

thought Appellant had been home all night because he was there when she went to sleep.  Appellant also denied leaving the house.

{¶46}  Yates testified Appellant owned a green Carhart coat, and she identified the coat for the jury.  She also identified her green Chevy Cavalier by the license plate, although the car looked blue in the pictures.  Yates testified there was a CD player in the back seat of the car that wasn't hers.  Yates denied taking Appellant to town after 10:00 p.m. on the 25th, and to her knowledge the car had not been moved since she came home from work on the 25th.

{¶47}  After the officers left, Yates investigated her car and noticed the gas tank was empty.  She also noticed the seat was not in the position she had left it in when she came home from work.  She does not drive with the seat "leaned back."  Yates testified she began to feel sick.

{¶48}  The next day after M.S. was found, Alisa texted Appellant while she was at work and advised him about her.  She testified Appellant responded "I was thinking the worst that they would find her dead and blame me.  That shit isn't cool at all.  I'm never talking to anyone again unless you are."

{¶49}  Yates also testified Appellant had a friend who lived on Oakland Road, near Landrum Cemetery.  She and Appellant had been to his residence quite a few times.

7.  The Teenagers who found M.S.

{¶50}  Three teenagers found M.S. and described, similarly, that she was completely naked, crying, asking for her mother, and obviously injured. K.D. testified that M.S. had black and blue swollen eyes and cuts on her legs and feet.  K.D.'s sister Kaycee Davis testified M.S. did not look exactly like the missing child report she had seen because of her facial injuries and swelling.  The teenagers gave M.S. crackers and clothing.  They immediately called 911.

8.  M.S.

{¶51}  At the time of trial, M.S. was 8 years old and in the first grade. She was living with foster parents.  On day three of trial, M.S. testified "something bad" happened to cause her to go to the hospital.  She did not know the person who was "mean" to her and had never seen him before.[18]

{¶52}  M.S. testified on July 26, 2013, she was at home in her mother's room using the computer.  M.S. testified the mean person lied to

---

[18] Sgt. Conley's testimony included that when he responded to the scene where M.S. was found, M.S. told him that she was taken by a tall man with short hair.

"Coony" (Austin Coon), and said he was leaving to get "smokes." M.S. testified Austin was in the kitchen when she left with the man.

{¶53} M.S. testified she got into the man's car because he said he'd give her a piece of candy. The car was dark blue. No one else was in the car. The mean person took her to a place outside where there were trees and grass.[19]

{¶54} M.S. testified the "mean person" hit her eye and she cried. He told her to shut up. Then he hurt her face and her "bad spot."[20] Shortly after this testimony, M.S. became emotional and court recessed.

{¶55} When her testimony resumed, M.S. testified she was wearing her bathing suit. She indicated by shaking her head "yes" that the mean man removed her bathing suit, and indicated by shaking her head "no" that no one else was with her or the man. M.S. also indicated by nodding her head "yes" that she was lying down when the events occurred.

{¶56} After the man hurt her, he drove away. It was still night time. M.S. testified she cried and walked to where a nice girl found her and gave her clothes and crackers.

9. The Medical Witnesses

---

[19] Stephanie Herron, a BCI agent, testified she processed Landrum Cemetery and described it as "full of trees," with "full foliage," and "difficult to see from the road."

[20] M..S. pointed to her eye. She also indicated she wore clothes over the bad spot. The prosecutor asked her to draw clothing on the "bad spot" on one of the exhibits and she drew pants.

{¶57} M.S. was immediately taken to Adena Regional Medical Center ER. Jamie Myers, a pediatric sexual assault nurse examiner (SANE) on duty, testified M.S. presented withdrawn and tearful. She had "horrible bruising and swelling" to her face and was "caked" in dirt and mud. Due to the facial injuries, a CT scan was ordered. The report did not show injury to the brain.[21] Myers identified a series of photographs showing M.S.'s injuries when she presented on July 26th as accurate depictions.

{¶58} Due to M.S.'s presentation and the fact she was found naked, a sexual assault exam was also performed. Myers observed a laceration, bruising, and active bleeding in the vaginal area. She collected DNA swabs of the mouth, vaginal, and rectal areas. Myers opined to a reasonable degree of medical certainty that M.S.'s vaginal canal was penetrated, indicative of blunt force trauma.[22]

{¶59} Dr. Scott McAllum, a pediatrician at Adena Health Systems, testified he was contacted by either Julie Oates or Jamie Myers and upon discussion of M.S.'s facial injuries, head trauma, and some increased swelling, there was concern for closed head injury. Together they decided

---

[21] Myers described bruising and swelling on both sides of M.S.'s face, broken blood vessels under the skin of her neck caused by blunt force trauma or possible attempted strangulation, and bruises on her back and legs.

[22] Brittany Baisden, another SANE on duty that night, assisted with preparation of the sexual assault evidence kit and photographic documentation. Her testimony mirrored that of Jamie Myers. She also opined M.S.'s injuries were consistent with penetration. She recalled M.S. had no family member with her.

M.S. should be admitted overnight.  Dr. McAllum examined M.S. the next morning and also opined, to a reasonable degree of medical certainty, her injuries to the vaginal area were consistent with penetrating blunt force trauma to the vaginal area.[23]

{¶60}  Julie Oates, executive director of the Child Protection Center of Ross County, testified she is a licensed professional counselor who provides forensic interviews and counseling for children impacted by trauma.  She attempted to interview M.S. three times.

{¶61}  During the first interview, M.S. held her face, which was red, swollen, and painful.  As they talked, she began shaking.  M.S. told Oates that "he beat her up" and he "left her."  They terminated the interview and M.S. was hospitalized for observation.

{¶62}  When M.S. was discharged the next morning, she returned for a second interview.  She was initially talkative, but as they discussed the incident she became tearful and said she missed her mother.  She advised the perpetrator punched her and she also pointed to her genital area and stated that he "hurt her bad front."  She became further upset when she looked in a

---

[23] Another physician, Dr. Zoran Naumovski, a medical examiner for the Child Protection Center, testified he saw M.S. on August 13, 2013 in follow-up.  He reviewed her records and conducted a physical exam. He opined, to a reasonable degree of medical certainty, she had been physically and sexually abused and emotionally traumatized.

mirror, said she missed her mother, and the interview was terminated. Oates testified the third interview yielded no new meaningful information.

10.  The Township Employees

{¶63} Randolf Baker testified he and Alden Mapes, Sr., employees of Liberty Township Trustees, were checking the roads and Landrum Cemetery on Friday, July 26, 2013. They stopped to urinate behind the dense foliage around 9:31 a.m. and discovered a green Carhart coat, laid open, with the back to the ground. Mapes picked up the coat and returned it to the township house, thinking it belonged to the grass cutter. They were unaware M.S. was missing.

{¶64} When Officer Music stopped by on Monday investigating the missing child case, they gave the coat to him, showed him where it was found, and that the grass was "flattened" to the shape of the coat. On cross-examination, Baker admitted he initially threw the coat in the back of the dump truck the men were driving and did not handle it with special care. He also acknowledged that they haul gravel and trash in the truck.

{¶65} Alden Mapes, Sr., the other employee, corroborated Baker's testimony. He further testified the jacket was lying perfectly flat on the back, unzipped in the front, with the arms lying all the way down. He thought it odd that it was found in that manner.

11. <u>The BCI Witnesses</u>

{¶66}  Abby Schwaderer, a quality assurance manager for the BCI laboratory system, was permitted to testify as an expert in the area of forensic DNA.  Her testimony was lengthy.  Schwaderer testified she conducted DNA analysis regarding M.S. in 2013.  She testified on the green Carhart coat interior there was a mixture of two individuals' DNA: Appellant and M.S.  She opined to a reasonable degree of medical certainty that the DNA observed on the interior of the Carhart coat was consistent with M.S.'s DNA.  Also, a swab taken from the green Cavalier's passenger side interior door handle included M.S.'s DNA.  On cross-examination, Schwaderer admitted DNA lasts forever and her testing is unable to show how long DNA is on an item, how it got there, why it is there, or under what circumstances.

{¶67}  While the State's case against Appellant relied on circumstantial evidence, our standard of review is still the same. "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subject to the same standard of proof.  When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a

conviction." *State v. Bradford,* 1st Dist. Hamilton No. C-04-382, 20015-Ohio-2208, ¶ 24.

{¶68} The defense did not dispute M.S. was beaten, raped, and abandoned. In sum, the compelling and overwhelming circumstantial evidence established that Appellant was at the Stewart home immediately before M.S. disappeared, wearing a Carhart jacket and leaving in a dark-colored Chevy Cavalier. Appellant repeatedly told officers he had not left his home all evening, while Frank Sr. and Austin Coon both testified Appellant had been there earlier on July 25th. Michael Denney's testimony also places Appellant at the Stewart residence and in a dark-colored Chevy on the date and time in question. And, Austin Coon specified that Appellant was present just before M.S. disappeared, around 1:30-1:35 a.m.

{¶69} M.S. testified the man who hurt her offered her a piece of candy, and she got into his dark blue car. She testified it happened while Austin was in the kitchen. No one else was with her and the perpetrator.

{¶70} Furthermore, Alisa Yates verified that she owned the Cavalier, which was the only car they had for transportation. She verified that the car was not the way she had left it when she went to bed in the late evening of the 25th. She also verified that Appellant owned the green Carhart jacket

and that Appellant was familiar with the area where Landrum Cemetery is located as she had been there with him many times to visit a friend.

{¶71} Importantly, BCI personnel later tested the green Carhart jacket and discovered the presence of M.S.'s DNA on it. Appellant was wearing the green jacket on the surveillance video and when he stopped by the Stewarts the second time. The township workers found the green jacket at 9:31 a.m. on July 26th, in Landrum Cemetery, while M.S. was still missing. M.S. was found later on July 26th at 4:00 p.m. at a location one-half mile from the cemetery.

{¶72} Through cross-examination and closing arguments, Appellant's counsel set forth a vigorous defense. Counsel emphasized as follows:

> 1) That the credibility of Frank Sr., Austin Coon, and Michael Denney was suspect;
>
> 2) That reasonable doubt existed in that Austin Coon or Jeff Keelz may have been involved.[24]
>
> 3) That police did not follow up on a tip called in around the same time M.S. disappeared indicating someone driving an older model Chevy Cavalier was "looking for a child to abduct."
>
> 4) That the integrity of the evidence was questionable because the green Carhart jacket was first thrown into the

---

[24] Cassie Martin testified she went to the Stewart house immediately upon learning of M.S.'s disappearance. She noticed Austin Coon, who had been at her house on July 25th, had changed the clothes he was wearing on the 25th by the time she saw him at the Stewarts. Martin also testified she overheard Frank Sr. and Frank Jr. "coaching" Austin Coon as what to tell the police. Jeff Keelz was Brenda Stewart's friend or paramour.

back of a township truck and not turned over as evidence
until a couple of days later;

5)  That Austin Coon failed to immediately identify
Appellant; and,

6)  That M.S. initially told Julie Oates that Frank Jr. took
her to a park the night she was taken and during the
second interview she indicated that Austin or her brother
had been in the car was when she was taken.

**{¶73}**  However, Frank Sr. and Austin Coon were cross-examined vigorously about the conflicting testimony and Austin's initial lies to law enforcement.  Defense counsel also emphasized Austin's initial failure to identify Appellant.  Counsel also elicited testimony from the BCI personnel which acknowledged that DNA testing is unable to pinpoint when and how DNA is found on an item and that transference and cross-contamination of DNA can occur.

**{¶74}**  Additionally, Counsel emphasized that Austin could not say for sure that the person driving the Cavalier away from the Stewart residence was Appellant, that M.S. was inside the car, or that Austin saw Appellant take M.S.  Counsel emphasized that there was no testimony that anyone saw Appellant take M.S., beat her, or rape her.  The jury also heard M.S.'s testimony that she did not know the person who hurt her.[25]

---

[25] M.S. testified Austin and her mother's friend Jeff were "nice."  It is difficult to imagine M.S. could credibly testify, without breaking down in some manner, that these persons longtime known to her were "nice" if one of them was, in fact, the perpetrator.

{¶75} Among the jury instructions given by the trial court was that Appellant was to be presumed innocent until his guilt was established beyond a reasonable doubt as to every essential element charged in the offenses; that the jury might consider direct and circumstantial evidence, and that the jury were the sole judges of credibility and weight of the evidence. While it is true that several of the witnesses' credibility was challenged, especially Austin Coon's, it was the province of the jury to resolve conflicts in the evidence. A jury sitting as the trier of fact is free to believe all, part or none of the testimony of any witness who appears before it. *Grube, supra*, at 31; *See State v. Long,* 127 Ohio App.3d 328, 335, 713 N.E.2d 1 (1998); *State v. Nichols,* 85 Ohio App.3d 65, 76, 619 N.E.2d 80 (1993). A jury is in the best position to view the witnesses and to observe witness demeanor, gestures and voice inflections, and to use those observations to weigh credibility. *See Myers v. Garson,* 66 Ohio St.3d 610, 615, 614 N.E.2d 742 (1993); *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Appellate courts should not generally second guess juries on matters of weight and credibility. *See State v. Vance,* 4th Dist. Athens No. 03CA27, 2004-Ohio-5370, at ¶ 10.

{¶76} Were the above evidence not enough, the State also presented the testimony of BCI Special Agent Steve Burke and Lieutenant Tabitha Sprague. Burke testified he conducted a recorded interview with Appellant around 10:00 a.m. on July 26th. The interview was played for the jury. During the interview, Appellant stated he had never met or seen M.S. He was "pretty sure" she had never been in his car. He repeatedly denied leaving his house at all, or driving Alisa's vehicle. He did not know why the car was warm at 3:00 a.m. Appellant stated he got in the car to move some stuff and probably moved the seat back. Appellant denied leaving even after being told Alisa said he left and after being told they would be looking at surveillance tapes.

{¶77} During the interview, Appellant said he knew Frank and had been to his house, most recently a week or so prior. Frank sold pills and Appellant bought some Vicodin from him.[26] He denied knowing anything about buying stereo equipment. The jury apparently assigned little or no credit to Appellant's statements in the recorded interview, which completely contradicted the testimonies of Austin Coon, Frank Sr., Appellant's girlfriend, and his own brother Eric.

---

[26] We are unsure whether this fact is referencing Frank Sr. or Frank Jr.

{¶78} Furthermore, the jury also heard jail recordings of his mother's and brother's calls and visits with Appellant. Lieutenant Sprague of the Jackson County Correctional Facility described the procedure for jail visitation and documentation of visits, and she identified the logs of Appellant's visitors to be fair and accurate. Appellant's mother and brother visited him various times and portions of the recordings were played for the jury.[27] On August 2nd, Appellant can be heard stating "I was really fuckin' drunk that night, but I'm almost a hundred percent I didn't leave the house that fuckin night. I'm almost a hundred percent sure I didn't leave the house that night. That's my story, and I'm stickin' to it."

{¶79} On an August 9th visit, Appellant's brother told him they had his coat.[28] Appellant replied "That's what I heard. I don't know about the (unintelligible) or how they got it. The only thing I can figure out about that. It could be that little girl or something.' If she was on the porch and in the cold she was. I mean, I don't know."

{¶80} On an August 16th visit:

"Yeah, they got a little bit of shit on me. But the little bit of shit they got on me is like (unintelligible). I don't really one hundred percent. I'm honest with you and Mom. I really don't remember what happened that night. But what I do know is that I never took that little girl. And if I did, then there was

---

[27] The identity of the parties' voices was stipulated.
[28] We presume this to be a reference to the green Carhart jacket.

somebody else in that car with me. (Unintelligible) little fuckin' kid, when I've got four kids of my own. I'd rather give them (unintelligible) than somebody else's. * * * But I'm tellin' ya right now, that night I was on some drugs that I wasn't used to."

{¶81} On August 30th:

"They wouldn't have enough evidence to charge me with the abduction charge because it has to be without a reasonable doubt that I forced that kid to come with me. * * * Not, 'Here baby. I've got a Jolly Rancher.' (Unintelligible) not fuckin' snatch her and grab her. * * * They can't prove that."

{¶82} On September 7th:

"I'm smarter than that. Even the next day when I wasn't drunk I looked in my car just to make sure some off the wall shit didn't happen. And there wasn't nothin' in my fuckin' car, and if there was something' in my fuckin' car, they put it there."

{¶83} Appellant's comments in the jail recordings may be interpreted as admissions that he did leave his home the night of July 26th, that he did go to the Stewart residence, and that the green coat was his. His comments may be construed as minimizing his recollection of the events due to drug and alcohol use. He seems to indicate that, at least, he could not be convicted of abduction. And, he admitted he was "stickin' to his story."

{¶84} Ultimately, the jury was in the best position to determine the credibility of the witnesses and the evidence, and we defer to their judgment. We do not find this to be the exceptional case where the evidence weighed heavily against conviction. Therefore, we do not find the jury lost its way,

causing a manifest miscarriage of justice. Based on the foregoing we find

that competent credible evidence supports the finding that Appellant is the

person who removed M.S. from her home, committing the felonies of

kidnapping and abduction, and further, committing the felonies of rape,

gross sexual imposition, and felonious assault. As such we overrule

Appellant's second assignment of error and affirm the judgment of the trial

court.

{¶85} Inasmuch as we have found Appellant's convictions are

supported by the manifest weight of the evidence, we further find them to be

supported by sufficient evidence. Our finding as to Appellant's "manifest

weight" argument is dispositive of his sufficiency-of-the-evidence claim. As

such, we also overrule Appellant's first assignment of error and affirm the

judgment of the trial court.

> "III. THE TRIAL COURT ERRED WHEN IT FAILED TO
> MERGE CONVICTIONS FOR GROSS SEXUAL
> IMPOSITION WITH RAPE AND CONVICTIONS FOR
> KIDNAPPING WITH ABDUCTION."

## A. STANDARD OF REVIEW

{¶86} Appellate courts apply a de novo standard of review in an

appeal challenging a trial court's determination of whether offenses

constitute allied offenses of similar import that must be merged under R.C.

2941.25. *State v. Mullins,* 4th Dist. Scioto No. 15CA3716, 2016-Ohio-5486,

¶ 11. *State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28; *State v. Cole,* 4th Dist. Athens No. 12CA49, 2014-Ohio-2967, ¶ 7.

## B.  LEGAL ANALYSIS

{¶87}  The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb," and this protection applies to Ohio citizens through the Fourteenth Amendment and is additionally guaranteed by Article I, Section 10 of the Ohio Constitution. *Mullins, supra,* at ¶ 8.  This constitutional protection prohibits multiple punishments for the same offense being imposed in a single trial absent a clear legislative intent to the contrary. *Id. See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, (1969), overruled on other grounds, *Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, (1989); *Missouri v. Hunter,* 535 U.S. 359, 103 S.Ct. 673, (1983).

{¶88}  The General Assembly enacted R.C. 2941.25 to specify when multiple punishments can be imposed in the same trial:

> (A) Where the same conduct by the defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them. *Mullins, supra,* at ¶ 9.

{¶89} Merger is a sentencing question where the defendant bears the burden of establishing his entitlement to the protection of R.C. 2941.25 by a preponderance of the evidence. *Mullins, supra,* at ¶ 10. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

{¶90} Under current Ohio law courts can only impose multiple punishments in a single trial for a defendant's conduct under two situations: 1) where the charged crimes are not allied offenses, i.e. it is not possible to commit multiple crimes with the same action, *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061; and 2) the crimes are allied offenses but the defendant's actions have dissimilar import, i.e. the crimes were committed separately, or with a separate animus, or the resulting harm for each offense is separate and identifiable. *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph one of the syllabus. *See Mullins, supra*, at ¶ 10.

1. Are Appellant's convictions for gross sexual imposition and for rape allied offenses of similar import?

{¶91} The trial court found:

"The Court finds that there are separate harms suffered by the victim. The child testified that the Defendant had touched the victim's breast for sexual or gratifying himself. (Sic.) The Defendant created a separate harm when he raped the victim since he inserted part of his body in the victim's vagina. The Defendant also caused the victim serious physical harm when he committed the rape. The serious physical harm element demonstrates that the Defendant had a separate motivation from when he committed the gross sexual imposition counts."

{¶92} However, Appellant argues this conclusion is not supported by the record. He points out M.S. provided very little information about what happened to her and the record contains only the medical evidence of bruising, scratches, and vaginal penetration. Appellant concludes there was no separate harm and there was no separate animus.

{¶93} In response, the State argues that Appellant raped M.S. by forcibly penetrating her vaginal opening with an unidentified object. He committed gross sexual imposition by groping her breasts, separate conduct that occurs with a separate animus from rape. The State also cites M.S.'s testimony that the man removed her bathing suit and the fact that she had bruising on her clavicle to reasonably infer that Appellant violently groped her breast. The State argues the acts of rape and groping caused separate harms. The violent rape, which caused tearing in her genital region, caused psychological and serious physical harm. Groping her breasts caused psychological harm. The State concludes the trial court did not err. While

we agree with the trial court's ultimate conclusion that merger was not required, we do so on a different basis.

### a. Allied Offenses

{¶94}  Initially, we look to see if the charges Appellant faced represent allied offenses.  To accomplish that we must look at Appellant's conduct to determine if it was possible to both commit one offense and commit the other by that conduct. *Johnson* at 48; *Mullins, supra,* at 13.

{¶95}  Rape, R.C. 2907.02, provides: "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies: * * *(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."  The trial court instructed the jury as to the legal definition of "sexual conduct."  The court specified that "Penetration, however slight, is sufficient to complete vaginal or anal intercourse."  Jamie Myers and Brittany Baisden, the SANEs, and Dr. McAllum all testified M.S. had been penetrated in the vaginal area.

{¶96}  Gross sexual imposition, R.C. 2907.05, Count 7, provides in relevant part:

> "(B) No person shall knowingly touch the genitalia of another,
> when the touching is not through clothing, the other person is
> less than twelve years of age, whether or not the offender
> knows the age of that person, and the touching is done with an

intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."

**{¶97}** M.S. testified and indicated the perpetrator hurt her vaginal area. We do not find evidence that Appellant touched M.S.'s breast readily apparent or necessarily inferred. However, in order that penetration occurred, it necessarily includes that her genital or pubic region was touched, thus unclothed touching of her genitalia did occur. It was possible that Appellant committed the acts of rape and gross sexual imposition with the same conduct. *See State v. Vang*, 9th Dist. Summit No. 23206, 2007-Ohio-46, fn.1. As such we find the offenses are allied.

b. Dissimilar Import

**{¶98}** Even though it was possible for Appellant to commit the above offenses with the same conduct, and thus they are allied offenses, we conclude he can be separately punished for each one. Appellant's conduct of raping M.S. and his commission of gross sexual imposition were of dissimilar import, e.g., they were committed with separate animus and/or resulted in separate, identifiable harms.

**{¶99}** Here, the act of rape was completed and proven by the actual physical penetration of M.S.'s vagina. However, the gross sexual imposition count also required that the touching was done with intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any

person. We find evidence supports the inference that Appellant's acts were committed with a separate animus.

{¶**100**}  In *State v. Kuritar,* 2nd Dist. Montgomery No. 24875, 2012-Ohio-3849, the defendant was convicted of sexual imposition after he and another male spent the night partying with two unmarried adult females in an apartment. Kuritar argued on appeal that the evidence did not support the finding that he knew his conduct was offensive. However, the appellate court noted at ¶ 28:

> "The venue, and the drinking games, could have been appropriate to flirtation leading up to sexual activity. But there is no indication in this record that any flirtation occurred, or that anything occurred that would have led Kuritar to conclude that his touching the breast of a sleeping woman, whom he had just met that night, and with no history of expressed sexual interest between them, would be less than offensive."

{¶**101**}  Similarly, we find there can be no reasonable inference that six-year-old M.S., who was taken by a stranger under false pretenses from her home, removed to a dark cemetery, and initially struck in the face and eye and told to "shut up" before she was touched and raped, would find Appellant's touching of her genitalia to be anything but abusive, humiliating, harassing, and degrading.

{¶**102**}  Furthermore, gross sexual imposition may be proven by evidence of purpose to arouse or gratify the sexual desire of any person. The

trier of fact may infer a purpose of sexual arousal or gratification from the type, nature, and circumstances of the contact, among other relevant factors. *State v. Barrie*, 10th Dist. Franklin No. 15AP-848, 2016-Ohio-5640, ¶ 18. *State v. Crosky,* 10th Dist. Franklin No. 06AP–655, 2008-Ohio-145, 2008 WL 169346, ¶ 47. We find it is also reasonable to infer that under the circumstances, Appellant acted with a purpose to sexually arouse or gratify himself.

{¶103} Furthermore, the acts of rape and gross sexual imposition also resulted in separate and identifiable harms. Jamie Myers observed a laceration, bruising, and active bleeding in M.S.'s vaginal area – obvious serious physical harm. And, it was also obvious to the first responders and medical providers that M.S. was emotional and tearful, and would have been evident to the jurors when M.S. became emotional during her testimony. Dr. Zoran Naumovski opined to a reasonable degree of medical certainty that M.S. had also been emotionally traumatized. We find Appellant's crimes resulted in M.S. suffering separate and identifiable physical and psychological harms. Because the resulting harms are different in nature, these two offenses are "of dissimilar import," i.e. "they are not alike in their significance and their resulting harm." *Ruff* at 21; *Mullins, supra,* at 20. We find the trial court correctly rejected merger of these offenses.

2. Are Appellant's convictions for kidnapping and for abduction allied offenses of similar import?

{¶104} Here, the trial court found as follows:

"The Defendant's action of taking the victim from her home constituted the kidnapping. The Defendant's conduct of (sic.) her to the cemetery where he restrained her liberty by threat of undo circumstances that created a risk of physical harm. There are separate harms involved in the Defendant's actions. One harm is created by removing the victim from her home. A second harm occurred when the Defendant restrained the victim's liberty at the cemetery. The Court also finds that the kidnapping and abduction were committed separately. The kidnapping was committed when the Defendant took the victim from her home. The abduction took place when the Defendant restrained her liberty at the cemetery. These acts were committed separately."

{¶105} Appellant contends the purpose and harm involved in kidnapping and abduction is not separate and identifiable, nor was the harm distinguished. As such, the kidnapping and abduction counts should be merged as allied offenses of similar import for purposes of sentencing. In response, the State argues the initial kidnapping occurred when Appellant lured M.S. from her home, and that this act was significantly independent from the abduction which occurred when he restrained her in the cemetery. Further, the State contends the harm created by the acts was separate and distinct. Again, we agree with the trial court's conclusion that the kidnapping and abduction offenses do not merge, nor would the kidnapping and rape offenses merge.

{¶106} Again, examining the crimes at issue, kidnapping requires proof that a victim was removed by force, threat, or deception, from the place where the person is found, or the victim's liberty was restrained. Abduction requires proof that the victim's liberty was restrained by force or threat, and under circumstances that created a risk of physical harm or placed the victim in fear. Appellant kidnapped M.S. by deceiving and removing her from her home. M.S. testified she got into the perpetrator's car because he offered to give her a piece of candy.

{¶107} It does not appear that Appellant restrained M.S. by force or threat to kidnap her, although one could argue that once she, a six-year-old child, was in Appellant's car, she was there by force as she would be unable to drive herself or remove herself from the vehicle. However, we find Appellant's conduct in abducting M.S. was separate and distinct crime. Once Appellant and M.S. arrived at the cemetery, the evidence supports the inference that she was restrained by force or threat.

{¶108} M.S. testified the perpetrator took her to a place with trees and grass, hit her in the eye, and told her to shut up. Then he raped her. Jamie Myers testified M.S.'s face was bruised and swollen, she had broken blood vessels under the skin of her neck, and bruises on her back and legs. Whether these injuries occurred solely because of Appellant's beating her or

because she fought back, it is reasonable to infer that her liberty was restrained by use of force.

{¶109} Appellant's act of kidnapping was completed by deceiving her into leaving with him and transporting her from home. However, he continued on to the cemetery where he restrained her by force or threat, thus also committing the crime of abduction. We agree with the trial court's finding that separate crimes were committed. As we observed in *State v. Smith,* 4th Dist. Scioto No. 15CA3686, 2016-Ohio-5062, ¶115, the conduct, animus, and import of alleged allied offenses must all be considered. If one of the *Ruff* questions is answered affirmatively, then separate convictions are permitted. *Id.*

{¶110} Appellant further contends if the kidnapping is based on restraint of liberty, it would arguably merge with the rape conviction. Appellant urges correction of the alleged error by merging kidnapping with rape. We also disagree with this conclusion.

{¶111} M.S.'s kidnapping occurred by deception. However, we find the analysis in *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, further illustrative of the significance of movement or transport of a victim. There, the appellate court considered whether Echols' convictions for rape and kidnapping of two separate victims in two separate incidents in

1994 and 1999 should have been merged as allied offenses of similar import for purposes of sentencing. In one instance, as to the first victim, K.C., the court determined that the offenses should have been merged. *Id.* at 39. However, in the case of the second victim, M.M., the appellate court noted:

> "She was abducted from the bus stop. Appellant forced her to get into his vehicle, hit her with a brick once in the car, and he drove her away from the area. The trial court's finding that this movement was significant and encompassed an increased risk of harm is supported. The asportation of M.M. constituted a separate crime for which appellant may be separately punished." *Id.* at 40.

{¶112} M.S. was kidnapped by deception and transported a significant distance to the cemetery where Appellant thereafter committed the rape. These constitute separate crimes for which Appellant may be separately punished. As such, the trial court did not err by failing to merge the offenses of kidnapping and rape under the facts presented herein.

{¶113} For the foregoing reasons, we find no merit to Appellant's second assignment of error. As such, both assignments of error are overruled and the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Jackson County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J.:   Concurs in Judgment and Opinion.
Hoover, J.:   Concurs in Judgment and Opinion as to Assignment of Error I;
             Concurs in Judgment Only as to Assignment of Error II.

For the Court,

BY:   _____
Matthew W. McFarland, Judge

**NOTICE TO COUNSEL:      Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**