[Cite as *State v. Benge*, 2021-Ohio-152.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,                 :        CASE NO. 20CA1112

    vs.                                 :

MICHAEL BENGE,                          :        DECISION & JUDGMENT ENTRY

    Defendant-Appellant.                :

---

APPEARANCES:

Brian T. Goldberg, Cincinnati, Ohio for appellant.[1]

C. David Kelley, Adams County Prosecuting Attorney, and Ryan M. Stubenrauch, Assistant
Prosecuting Attorney, West Union, Ohio, for appellee.

---

CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED: 1-14-21
ABELE, J.

{¶ 1} This is an appeal from an Adams County Common Pleas Court judgment of
conviction and sentence. Michael Benge, defendant below and appellant herein, assigns the
following errors for review:

    FIRST ASSIGNMENT OF ERROR:

    "THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF
    LAW AND/OR AGAINST THE MANIFEST WEIGHT OF THE
    EVIDENCE TO SUSTAIN MR. BENGE'S CONVICTION."

    SECOND ASSIGNMENT OF ERROR:

---

[1] Different counsel represented appellant during the trial court proceedings.

"THE TRIAL COURT ERRED TO THE PREJUDICE OF MR. BENGE BY DENYING HIM HIS RIGHT TO PRESENT A COMPLETE DEFENSE."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED TO THE PREJUDICE OF MR. BENGE BY ALLOWING THE STATE OF OHIO TO PLAY THE INTERVIEW FROM THE MAYERSON CENTER IN ITS ENTIRETY."

FOURTH ASSIGNMENT OF ERROR:

"MR. BENGE DID NOT RECEIVE A FAIR TRIAL WHERE THE PROSECUTOR ENGAGED IN PROSECUTORIAL MISCONDUCT."

FIFTH ASSIGNMENT OF ERROR:

"THE REAGAN TOKES ACT, AS ENACTED BY THE OHIO LEGISLATOR [SIC.] IS UNCONSTITUTIONAL, AND THE TRIAL COURT ERRED BY SENTENCING MR. CONANT [SIC.] UNDER THAT ACT."

SIXTH ASSIGNMENT OF ERROR:

"THE CUMULATIVE EFFECT OF THE PRECEDING ERRORS

DENIED MR. BENGE HIS CONSTITUTIONAL RIGHT TO A

FAIR TRIAL."

{¶ 2} In August 2019, an Adams County Grand Jury returned an indictment that charged appellant with (1) one count of rape in violation of R.C. 2907.02(A)(1)(c), a first-degree felony; (2) one count of rape in violation of R.C. 2907.02(A)(2), a first-degree felony, and (3) one count of kidnapping in violation of R.C. 2905.01(A)(4), a second-degree felony. Appellant entered not guilty pleas.

{¶ 3} Appellant filed a motion for competency evaluation on October 25, 2019. In

December 2019, the trial court found appellant to be competent to stand trial. The report stated that appellant "is of borderline to low-average intellect," and that he "may also require information to be presented repeatedly and slowly in order for him to retain some information."

{¶ 4} On January 8, 2020, appellant filed a motion to introduce evidence of the victim's prior consensual sexual acts and use of an intrauterine device. After the trial court held a hearing pursuant to *State v. Boggs,* 63 Ohio St.3d 418, 588 N.E.2d 813 (1992), the court excluded the evidence. On February 7, 2020, pursuant to appellee's request, the trial court accepted the appellee's nolle prosequi and dismissed count one.

{¶ 5} At the February 10, 2020 trial, Keisha Lewis, J.L.'s mother, testified that J.L. (the victim) is 21 years of age and has cerebral palsy due to medical complications suffered at birth. Lewis explained that J.L. cannot speak clearly, cannot walk, dress, bathe or toilet without assistance, and is wheelchair dependent. Lewis stated that J.L. is left-handed, has limited use of her arms and legs, but can use her electric wheelchair by operating a joystick with her hand. J.L. can also use a phone, but has difficulty with fine motor skills and cannot roll if on her side.

{¶ 6} J.L. testified that she is 21, lives with her father, and her favorite things to do include using her laptop and playing with her baby doll. J.L. stated that on June 11, 2019, she lived in the village of Seaman with her boyfriend, father, father's girlfriend, brother, and niece. J.L. explained that she visited Ashley Moore's house at about 9:00 a.m. on June 11 to "hang out." J.L. testified that she has known appellant for three to five years, and he hung out with her and Moore that day. Around 11:30 p.m., they returned to J.L.'s father's house. J.L.'s father and her boyfriend were at the house. Later, J.L., appellant and Ashley returned to Ashley's house and because Ashley's home does not have a wheelchair ramp, appellant carried J.L. into

the house.

{¶ 7} J.L. stated that she sat on the bed when Ashley left to return her wheelchair to her father's house and to see a friend. J.L. testified that she asked appellant to cover her, which he did, and then appellant visited the bathroom for a long time. After appellant exited the bathroom, he turned off the light and climbed into bed with J.L.. J.L. thought that maybe appellant was tired and intended to sleep, but soon "he started rubbing on me," and touched her stomach and buttocks. Appellant also asked "does that feel good?," and J.L. replied, "yes," because she "was nervous." J.L. stated, "I felt his finger, dick [inaudible] out of his pants and onto my butt." J.L. testified that she then felt appellant pull down her pants and she "felt a [inaudible] pain in the back of my vagina." Appellant "put his penis in the back of my [vagina]," and J.L. could not move or leave. J.L. testified that she did not want appellant to engage in this behavior.

{¶ 8} J.L. acknowledged that she did not speak, and that she could hear appellant "taking deep breath[s]," while appellant tried to move in and out inside of her. J.L. stated that appellant then rolled onto his back and said, "man that felt good." Appellant then walked around, showed J.L. his penis and "wanted me to feel it and I said no." Appellant then told J.L. that he intended to walk to the pop machine, get a pop, and return. Before appellant left, however, J.L. said he "looked at me and said don't tell nobody." Soon after appellant left, J.L. called Ashley and her boyfriend. J.L. also testified that, earlier that afternoon, she told appellant she "liked the way he looked," and "if I didn't have boyfriend I would like to f**k you," but J.L. stated that she was joking when she said that.

{¶ 9} Ashley Moore testified that she attended school with J.L. and had known her for

approximately six months. Moore has also known appellant for two or three years. Moore stated that she, J.L., and appellant hung out that day, that she heard J.L. tell appellant she liked him, and that she wanted to have sexual relations with him. Moore testified that this was not the first time J.L. had said that, and J.L. was not joking. Moore also stated that J.L. made statements in front of her father and her boyfriend about wanting to have sex with the appellant, and Moore told J.L. it "wasn't right" and "wasn't fair for her to make her boyfriend feel like that."

{¶ 10} Moore further stated that she was at her house on June 11, 2019 with J.L. and appellant. After J.L. arrived in her electric wheelchair, which they could not get into the house, Moore stated that she thought it may rain and that she should return the wheelchair to J.L.'s father's house. Moore also planned to visit a friend during this time. Moore stated that when she left, J.L. was propped up on the bed in Moore's bedroom. Moore explained that her parents, sister, brother-in-law, and sister's children were upstairs, and her brother downstairs on the couch. Moore testified that while she was gone, J.L. called her and stated, "it's an emergency," so Moore returned. Moore was gone about 15 or 20 minutes, and, when she returned, J.L. was on the phone with her boyfriend, Scott. J.L. told Moore, "Mikey had raped [her]." Moore also stated that when appellant returned, Moore asked if he had done anything and appellant said no.

{¶ 11} Emily Harman, Social Worker and Forensic Interviewer at the Mayerson Center at Cincinnati Children's Hospital, testified that she interviewed J.L. in June 2019 after an Adams County Sheriff's Office referral. After the interview, Harman recommended a pregnancy test and serum testing. At trial, the prosecution played for the jury the audio and video recording of the interview. In the video, J.L. states that when appellant got into bed with her, she thought,

"no big deal maybe he is just laying with me * * * maybe he is being a friend and laying with me." In the video, J.L. also states that "it felt like I felt like he was trying to get what he want. And * * * people know me, people know that I am not a liar. I am not liar when it comes to that. I might be a lot of things but I am not a liar." When asked if she could tell appellant to stop or tell him no, J.L. replied, "I think I was [inaudible] telling him, not telling him [inaudible] do what he wanted because you never know if has a gun or whatever. * * * But I would rather be raped than killed." J.L. also states, "[I]f I am wrong at all I will [inaudible]. I [inaudible] what I said, I [inaudible] I did not do anything at that time * * * [f]or him to do what he did."

{¶ 12} Cathleen Hackett, Forensic Examiner and Sexual Assault Nurse Examiner, testified that she performed a rape kit in June 2019. Hackett took swabs of J.L.'s mouth, stomach, buttocks, upper thighs, waist, vagina, sweat pants, as well as fingernail scrapings. In addition, Hackett collected J.L.'s underwear for the crime lab kit. During the rape exam, Hackett noticed an abrasion on the victim's vaginal opening. During cross-examination, defense counsel elicited some information about the victim's IUD. The trial court, however, had already ruled this information to be inadmissible and gave the jury a curative instruction.

{¶ 13} Allison Gapinski, Forensic Scientist at Ohio Bureau of Criminal Investigation (BCI), testified that the victim's vaginal and buttocks DNA samples were positive for semen, and the DNA a mixture of J.L. and appellant, with the estimated frequency of occurrence of the sperm fraction DNA profile rarer than one in 1 trillion unrelated individuals. Appellant is also the major DNA contributor on the victim's underwear.

{¶ 14} Kenneth Dick, Adams County Prosecutor's Office investigator, interviewed appellant on June 12, 2019 and advised him of his *Miranda* rights. At trial, the state played the

audio and video recording of the interview for the jury. In the video, appellant states that J.L. is "a sweetheart * * * a sweet person and I love her to death." Appellant further states that he has known J.L. for "at least ten or twelve years," and he knows all of the victim's family, and he respects her father. Appellant told Investigator Dick that on the evening in question, he left to "get a pop" "because she [J.L.] keeps touching on me and stuff." Appellant said that J.L. was "[t]ouching on my leg and sh*t that's, that's flirting. And like you're killing me. Just like the way that she talked." Appellant stated:

> I made a statement earlier that [inaudible] somebody else there that was around. I told them hey if she wants some dick I'll give her some dick. * * * Because I ain't got no problem giving her some dick. * * * Pussy is pussy right? I mean they are all the same.

Appellant also stated that there was no way that he could "do it" and not talk to her dad first because he respected J.L.'s father. When Dick informed appellant about his DNA in J.L.'s vagina, appellant said that J.L. must have rubbed his semen in her vagina because, "I did not put my dick in her vagina."

{¶ 15} At the close of the state's case, defense counsel made a Crim.R. 29 motion for judgment of acquittal as to both counts one and two. The trial court overruled appellant's motion.

{¶ 16} Appellant testified that he lives with his mother and works for a local farmer. Appellant explained that in 2004 he was about 27 years of age when he moved to Ohio after he sustained a head injury that causes difficulty with comprehension. On the day in question, as appellant walked on railroad tracks he saw Ashley Moore and J.L. They all went to J.L.'s father's house where appellant told J.L.'s father, "man, you need to do something with your daughter. Because right before we got there, his daughter looks at me as I'm walking down and

across the street to him. She says, my God Mikey when are you? When are you going to f**k me?" Appellant stated this was about 10:30 p.m. When asked what may have given appellant an indication that "some sort of familial relationship" with J.L. was permissible, appellant replied, "She did herself. Her dad did, her dad told me, he said, Mike screw her." However, the trial court instructed the jury to disregard this statement as hearsay.

{¶ 17} Appellant continued that he returned to Ashley Moore's house with Moore and J.L. and Moore asked appellant to carry J.L. inside the house because her home does not have a wheelchair ramp. Appellant carried J.L. into Moore's room, sat her on the bed, and Moore put pillows around J.L. Appellant stated that the three talked until Moore left fifteen to twenty minutes later to return the wheelchair to J.L.'s father's home and to visit a friend. Appellant stated that Moore was gone for approximately an hour and a half to three hours.

{¶ 18} Appellant testified that while Ashley Moore's brother slept on the couch in the adjacent living room, and with Moore's parents and sister upstairs, he positioned himself at the end of the bed in Moore's bedroom. J.L. was at the top of the bed and asked appellant to cover her. After he covered J.L., appellant used the restroom and asked J.L. if she wanted him to remove Moore's pit bull from the room. Appellant stated that he did so and "pushed the door almost closed."

{¶ 19} Appellant further testified that he sat with J.L. for a moment and then asked, "are you sure you want to do this? Because she had referred to having sex with me earlier. She said, yeah. I said, for real, she said, yeah. I was like, okay. I said, well, we can do this if she wants this to happen." Appellant maintained that he and J.L. had consensual sex, that he got J.L. into "position" and "slid one finger in and slid them [J.L.'s pants] down three or four inches"

and "I push forward and she says, what about my boyfriend?" Appellant testified that he said:

> [S]top. I pulled out and I said, you know what? You're good. You're good. I'm sorry for bothering you. You don't have to tell anybody about it if you don't want to. It doesn't matter to me. I'm not ashamed, but I don't, you know, I don't know how you feel as a woman. Most women don't want people knowing that they're out sleeping around.
>
> That's not very commonly cool of it, I wouldn't think. So, I asked her to just forget about it cause I mean we didn't really even have sex. We started to and we stopped and then I proceeded to masturbate myself because as a man, I don't know if anybody else knows. But when you get feelings brought up and you become hard, you have, you have to do something with that. * * * Or you get what they call blue balls. * * * So I've proceeded to masturbate by myself, not with her and I got up and I left. * * * To the pop machine and I asked her if she wanted a pop and she said sure.

{¶ 20} Appellant stated that he then walked to a hardware store's pop machine, purchased two sodas and returned to Ashley Moore's house. After he arrived, Moore asked "did you screw her? I said, no. I said, we started to have sex. So, she said, she said, what about my boyfriend? I said, I pulled out and then I stopped. I said, I proceeded to jack off by myself. I never touched her anymore after that I said * * *." Appellant stated that after J.L.'s father arrived, at some point he was asked to leave and he went to another friend's house.

{¶ 21} On cross-examination, when asked about his prior statement to Investigator Dick, appellant stated, "It was all false." When asked if he would agree with the state that appellant told six different stories to Dick, appellant replied, "Yes, sir." The state asked, "And when you told Mr. Dick that your semen would have gotten [sic.] her vagina only because she rubbed it in it, is that, now you're saying that's inaccurate?" Appellant replied, "Her or her dad either one. Her dad came and examined her after everything was supposed to been done. The semen was laying on the couch on the, on a pillow behind her. So that part of Mr. Dicks [sic.] statement is still correct."

{¶ 22} On cross-examination, the state also elicited some information that appellant had previously been imprisoned, and the trial court gave the jury a curative instruction at defense counsel's request.

{¶ 23} At the conclusion of the trial, appellant renewed his Crim.R. 29 motion. The trial court, however, denied the motion a second time. After deliberation, the jury found appellant guilty of rape, but not guilty of kidnapping. The court (1) sentenced appellant to serve an indefinite mandatory minimum prison term of ten years to a maximum indefinite stated prison term of fifteen years, (2) ordered five years mandatory post-release control, (3) classified appellant a tier III sex offender, (4) ordered appellant to register every ninety days for life, and (5) ordered appellant to pay $979 in restitution to the Adams County Sheriff's Department. This appeal followed.

I.

{¶ 24} In his first assignment of error, appellant asserts that the evidence adduced at trial "is insufficient as a matter of law and/or against the manifest weight of the evidence to sustain [appellant's] conviction." In particular, appellant contends that he engaged in consensual sexual conduct, and that his disabilities "go directly to the issue of whether he had the specific intent to commit the crime of rape."

{¶ 25} A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Schroeder,* 2019-Ohio-4136, 147 N.E.3d 1, ¶ 59 (4th Dist.), citing *State v. Blanton*, 2018-Ohio-1278, 110 N.E.3d 1, ¶ 13 (4th Dist.); *State v. Wickersham*, 4th Dist. Meigs No. 13CA10, 2015-Ohio-2756, ¶ 22; *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

When reviewing the evidence's sufficiency, the adequacy of the evidence is the focus; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins*, syllabus. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). Further, an assignment of error based on sufficiency of the evidence challenges the state's prima facie case's legal adequacy, not its rational persuasiveness. *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 13.

{¶ 26} Therefore, when an appellate court reviews a sufficiency-of-the-evidence claim, the court must construe the evidence in a light most favorable to the prosecution. *State v. Dunn*, 4th Dist. Jackson No. 15CA1, 2017-Ohio-518, ¶ 13; *Wickersham, supra*, ¶ 23; *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996). A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 326 (2001).

{¶ 27} While a court of appeals may determine that a trial court's judgment is sustained by sufficient evidence, that court may also conclude that the court's judgment is against the weight of the evidence. *Dunn, supra,* at ¶ 15; *Wickersham, supra,* at ¶ 24; *Thompkins, supra*, 78 Ohio St.3d at 387. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their

verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." ' " *Wickersham*, *supra*, at ¶ 24, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶ 28} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider witness credibility. The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *Schroeder, supra,* at ¶ 61; *Dunn*, *supra*, at ¶ 16; *Wickersham*, *supra*, at ¶ 25. Because the trier of fact sees and hears the witnesses, appellate courts court will afford substantial deference to a trier of fact's credibility determinations. *Schroder* at ¶ 62. To decide whether the case sub judice is an exceptional case in which the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider witness credibility. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Thus, an appellate court will reverse a conviction only if the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice.

{¶ 29} In the case at bar, the jury found appellant guilty of rape in violation of R.C. 2907.02(A)(2). That statute provides "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Although appellant initially denied having sexual intercourse with J.L., his DNA appeared in

J.L.'s vagina.  Appellant also later admitted to engaging in sexual intercourse with J.L., but claims that J.L. consented.  Appellant contends that undisputed evidence exists that J.L. told appellant that she thought he is good looking, and "she wanted to f**k him."  Appellant points out that Ashley Moore heard the statement and testified that it was "said repetitively and not in a joking manner."  Moreover, appellant argues that at no point during the encounter did the victim tell appellant to stop, even though the victim can communicate.  Appellant also contends that he did not have the specific intent to rape J.L. due to his own cognitive disabilities.  Once again, before trial defense counsel requested a competency evaluation.  Although the trial court found appellant competent to stand trial, the evaluation stated that appellant "may also require information to be presented repeatedly and slowly in order for him to retain some information."  Appellant argues that a reasonable person confronted with similar circumstances would not have understood the victim's lack of consent, and it is "even more feasible" that someone like appellant would not have understood the victim's lack of consent.

{¶ 30} The state, however, contends that (1) appellant's testimony conflicts in numerous ways with J.L.'s testimony; (2) the jury heard sufficient evidence to conclude that J.L. did not consent to the sexual conduct, and (3) the state proved all of the elements of rape.  Further, the state asserts that appellant's argument about his "unspecified cognitive disabilities" does not relate to the sufficiency of the evidence, but rather is an attempt to establish a diminished capacity defense.

{¶ 31} Appellant cites *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519 (2d Dist.), in support of his arguments.  In *Hartman*, the defendant, convicted of three counts of rape, argued that the victim consented to the contact.  The court held:

> Ohio's rape statute does not require proof of the victim's lack of consent. * * * Consent is not an affirmative defense, but when applicable, consent is used as a defense to challenge the State's evidence on the element of purposeful force or compulsion. *State v. El-Berri*, 8th Dist. Cuyahoga No. 89477, 2008-Ohio-3539, ¶ 57. When consent is raised as a defense to a charge of Rape, the test of whether consent negates a finding of force is not whether a reasonable person confronted with similar circumstances would have understood that the victim did not consent, the test requires the trier-of-fact to find, beyond reasonable doubt, that the specific defendant's purpose or intent was to commit the crime of rape. *State v. Mundy*, 99 Ohio App.3d 275, 650 N.E.2d 502 (2d Dist.1994).

{¶ 32} The Second District observed that the Supreme Court of Ohio instructed that "[t]he determination of a defendant's mental state, absent some comment on his or her part, must of necessity be determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances." *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293. The Second District concluded that this "well-recognized process of inferential reasoning" * * * "by necessity incorporates an objective mechanism or standard in determining the defendant's state of mind by the use of circumstantial evidence. The trier of fact reviews the defendant's conduct in light of the surrounding facts and circumstances and infers a purpose or motive." *State v. Mundy*, *supra*, at 288.

{¶ 33} Moreover, proof of physical violence or physical resistance is not required to establish rape if the defendant creates in the mind of the victim the belief that physical force will be used if the victim does not submit. *State v. Umphries*, 4th Dist. Ross No. 11CA3301, 2012-Ohio-4711, ¶ 21, citing *State v. Schaim*, 65 Ohio St.3d 51, 55, 600 N.E.2d 661 (1992). Further, "[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988). "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear

or duress, the forcible element of rape can be established." *Umphries* at ¶ 16, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

{¶ 34} In *Hartman, supra,* the victim testified that her will was overcome by fear because she believed she would be hurt if she did not submit to the defendant's advances. *Hartman* is an example where "a sexual encounter between adults starts out as consensual, before changing into a non-consensual encounter." *Hartman* at ¶ 31. The *Hartman* court noted that the defendant, bigger and stronger than his victim, pushed the victim onto the bed, removed her clothes, and pulled her into the shower. This evidence could provide a reasonable finder of fact proof that Hartman purposely acted in a manner to induce fear in the victim and compelled her to submit to sexual conduct, against her will. *Id.* at ¶ 32.

{¶ 35} In the case sub judice, J.L., a cerebral palsy victim, could not fend off appellant's advances, regardless of whether appellant argues that she appeared to welcome the advances. While J.L. may have stated earlier in the day that she wanted to have sex with appellant, she testified in court, and stated during the Mayerson interview, that she had been joking. Moreover, the jury heard testimony that the victim has minimal mobility, could not retreat, and did not want appellant to do what he did. The victim testified that she replied "yes" to appellant asking her if it felt good when appellant touched her stomach because she was nervous. Further, the jury heard J.L.'s statements in the Mayerson interview that "I think I was [inaudible] telling him, not telling him [inaudible] do what he wanted because you never know if has a gun or whatever. * * * But I would rather be raped than killed." J.L. also stated, "[I]f I am wrong at all I will [inaudible]. I [inaudible] what I said, I [inaudible] I did not do anything at that time * * * [f]or him to do what he did." The jury also heard J.L.'s testimony that, after the sexual conduct

occurred, appellant told her, "don't tell nobody."

{¶ 36} " 'It is well settled that a rape conviction may rest solely on the victim's testimony, if believed, and "[t]here is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction." ' " *State v. Horsley*, 2018-Ohio-1591, 110 N.E.3d 624, ¶ 74 (4th Dist.); *State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 62, quoting *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, ¶ 40; quoting *State v. Lewis*, 70 Ohio App.3d 624, 638, 591 N.E.2d 854 (4th Dist.1990). In the case sub judice, the jury obviously found the victim's testimony credible, and the appellant's testimony, which appeared to involve several shifting explanations, to be incredible.

{¶ 37} In the case at bar, after our review of the record and after we weigh in the evidence and all reasonable inferences, consider witness credibility, we cannot say that the jury lost its way and created a manifest miscarriage of justice that requires the reversal of appellant's conviction. We believe that ample competent and credible evidence supports appellant's conviction and appellant's conviction is not against the manifest weight of the evidence. Moreover, sufficient evidence supports the jury's determination.

{¶ 38} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

                                                    II.

{¶ 39} In his second assignment of error, appellant asserts that the trial court erred to his prejudice by denying him his right to present a complete defense. Dr. Haley O'Connell conducted the pre-trial competency evaluation and appellant sought to use her testimony at trial to speak to his cognitive comprehension difficulties. The trial court, however, did not permit

O'Connell to testify.

{¶ 40} In particular, appellant argues that Dr. O'Connell was a crucial defense witness who went directly to the heart of their defense. Because the theory of defense involved consensual sexual conduct between the two parties, the refusal to permit her testimony severely limited the strongest argument defense counsel could have raised. Appellant thus contends that O'Connell could have explained appellant's "cognitive difficulties and his inability to fully understand things. Thus, to allow the jury to understand that appellant's specific purpose was not to commit the offense of rape."

{¶ 41} Appellee, however, points out that appellant cites no authority for his proposition that the trial court should have permitted him to call the competency expert. Appellee argues it is unclear how an expert could testify as to appellant's "specific purpose" of an act that he committed. Moreover, appellee cites *State v. Wilcox*, 70 Ohio St.2d 182, 199, 436 N.E.2d 523 (1982), where the Supreme Court of Ohio held: "The partial defense of diminished capacity is not recognized in Ohio." *Wilcox*, syllabus paragraph one. Therefore, "[a] defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that the defendant lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *Id.* at paragraph two of the syllabus.

{¶ 42} After our review, we agree with appellee and conclude that the trial court properly denied Dr. O'Connell the opportunity to present testimony related to diminished capacity. Of course, appellant could, and did, argue at trial about his personal understanding of the contact with the victim and argue to the trier of fact that he did not have the specific intent to commit the offense. The jury, however, listened to the entirety of the evidence and rejected appellant's

arguments.

**{¶ 43}** Accordingly, based upon the foregoing, we overrule appellant's second assignment of error.

### III.

**{¶ 44}** In his third assignment of error, appellant asserts that the trial court erred to his prejudice by allowing the state to play the Mayerson Center interview in its entirety. Appellant argues that the only portion of the interview related to medical diagnosis or treatment is the portion when J.L. talks about sexual intercourse, and the trial court should have excluded "the balance of the interview" as hearsay.

**{¶ 45}** Appellee, however, points out that appellant does not specify precisely which questions or statements are arguably improper. Further, appellee points out that a trained mental health professional conducted the interview with the disabled victim and testified that she evaluated the victim for future medical or mental health treatment. Thus, appellee reasons, the trial court properly admitted the questions and answers of the victim during the interview. See Evid.R. 803(4).

**{¶ 46}** "Decisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review." *State v. Wright,* 2017-Ohio-9041, 101 N.E.3d 496, ¶ 24 (4th Dist.), quoting *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032; *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19. Therefore, an appellate court should not disturb a trial court's ruling regarding the admissibility of evidence absent a clear showing of an abuse of discretion with

attendant material prejudice to the defendant.   *State v. Green*, 2009-Ohio-5199, 921 N.E.2d 276, ¶ 14 (4th Dist.).

{¶ 47} In the case at bar, the prosecution played the audio and video of the Mayerson interview during Emily Harman's testimony.   Harman, a social worker and forensic interviewer from Cincinnati Children's Hospital, interviewed J.L. and identified Exhibit 5, the DVD of J.L.'s interview.   Generally, statements made outside of the courtroom, offered at trial to prove the truth of the matter asserted, are inadmissible as "hearsay" unless an exception applies.   Evid.R. 801(C); Evid.R. 802; *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987); *Schroeder*, *supra,* at ¶ 50.   However, out-of-court statements made for purposes of medical diagnosis or treatment are hearsay, but admissible in court under the hearsay exception provided in Evid.R. 803(4).   Such statements are only admissible "insofar as reasonably pertinent to diagnosis or treatment."   Evid.R. 803(4).

{¶ 48} In *State v. Knauff*, 4th Dist. Adams No. 10CA900, 2011-Ohio-2725, the accused argued that a social worker's video-recorded interview of his five-year-old daughter did not satisfy the reliability threshold of Evid.R. 803(4).   We pointed out that to decide whether hearsay is sufficiently reliable for admission under Evid.R. 803(4), courts should examine several factors.   The first factor is the "selfish-motive" doctrine, i.e., "the belief that the declarant is motivated to speak truthfully to a physician because of the patient's self-interest in obtaining an accurate diagnosis and effective treatment."   *Knauff*, *supra*, at ¶ 28, quoting *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, at ¶ 34, citing *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988) (Brown, J., concurring).   We further noted in *Knauff* that another factor courts should consider is the medical professional's professional subjective reliance on the

statement because "physicians, by virtue of their training and experience, are quite competent to determine whether particular information given to them in the course of a professional evaluation is 'reasonably pertinent to diagnosis or treatment [,]' and are not prone to rely upon inaccurate or false data in making a diagnosis or in prescribing a course of treatment." *Knauff* at ¶ 28, citing *Eastham* at ¶ 41, 530 N.E.2d 409, quoting *King v. People* (Colo.1990), 785 P.2d 596, 602.

{¶ 49} Further, *Muttart's* non-exhaustive list of additional factors that a court should weigh when it considers whether out-of-court statements should be admissible under this exception are:

(1) Whether medical professionals questioned the child in a leading or suggestive manner and whether the medical professional followed proper protocol in eliciting a disclosure of abuse;

(2) Whether the child had a reason to fabricate, e.g., a pending legal proceeding or bitter custody battle;

(3) Whether the child understood the need to tell the medical professional the truth; and

(4) Whether the age of the child could indicate the presence or absence of an ability to fabricate a story.

*Muttart* at ¶ 49; *State v. Rutherford*, 4th Dist. Pike No. 17CA883, 2018-Ohio-2638, at ¶ 20.

{¶ 50} In *State v. Dever*, 64 Ohio St.3d 401, 596 N.E.2d 436 (1992), the Supreme Court of Ohio held that the common-law basis for the Evid.R. 803(4) exception should be broadened to consider the surrounding circumstances of the statements when children are concerned. Courts have held that young rape victims' statements to social workers, clinical therapists, and other medical personnel are admissible under Evid.R. 803(4). Further, the *Dever* rationale has been extended to adults who are developmentally disabled. *See, State v. Burnette* (1998), 125 Ohio App.3d 278, 708 N.E.2d 276, *see also, State v. Grider*, 8th Dist. Cuyahoga No. 75720, 2000 WL

146544,(videotaped interview of fifteen-year-old cerebral palsy victim with social worker admissible under Evid.R. 803(4)). While J.L. is neither developmentally disabled nor a child, she has cerebral palsy due to medical complications suffered at birth and reads at a fifth-grade level. Our review of the interview and transcript reveals that Emily Harman interviewed J.L. in a non-leading manner in order to gather information and to assess her physical, medical, psychological, and emotional health. Harman testified in court and subject to cross-examination. Harman testified that, based on her interview of the victim, she then consulted with medical staff who conducted pregnancy testing and referred J.L. for follow-up serum testing to ensure J.L.'s health. Harman's interview was reasonably pertinent to J.L.'s diagnosis and treatment. As in *Knauff*, in the case at bar the victim's mental health formed an essential purpose of the forensic interview, and the questions and answers were reasonably pertinent to medical treatment. Therefore, we do not believe that the trial court abused its discretion admitting the video-recorded Mayerson interview under Evid.R. 803(4).

{¶ 51} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.

IV.

{¶ 52} In his fourth assignment of error, appellant asserts that prosecutorial misconduct prevented him from receiving a fair trial. Specifically, appellant contends that the state committed prosecutorial misconduct when it elicited prejudicial, irrelevant information from appellant, then during closing argument vouched for the victim's credibility.

{¶ 53} First, appellant argues that appellee's inquiry during cross-examination about what appellant did while in Georgia, and appellant's answer ("prison"), constitutes improper,

prejudicial impeachment evidence. Apparently, appellant has a vehicular homicide conviction in Georgia. The state asked on cross-examination, "So, let's talk about Georgia. You were living in Georgia until about 2044 [sic.] is that right?" Appellant replied, "No, I was not living in Georgia at all," to which appellee replied, "Okay. What were you doing in Georgia?" Appellant replied, "Prison?" At this juncture, the trial court called a sidebar and recessed the jury. Appellee argued that because the defense claimed that appellant's head injuries may have impacted his behavior, this evidence is relevant to show that appellant's injuries sustained during the accident, which resulted in a vehicular homicide conviction, are "self-inflicted" injuries. The court, however, properly admonished appellee for the question, and indicated that it had no probative value. The court then asked defense counsel, "[w]here do you want to go now defense?" Counsel replied, "Your Honor, we would ask for a curative instruction based upon where we are in the trial, what's gone on and the limited nature of what's happened. We don't think necessarily that we would desire a mistrial at this point in time." The court thereupon instructed the jury to disregard the question and answer.

{¶ 54} "The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." *State v. Jackson,* 92 Ohio St.3d 436, 441, 751 N.E.2d 946 (2001), citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987); *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993). Therefore, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Powell*, 132 Ohio St.3d 233, 2020-Ohio-2577, 971 N.E.2d 865, ¶ 149, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Further, the Supreme Court of Ohio has found that prosecutorial misconduct constitutes reversible error only in " 'rare instances.' " *Keenan* at

405, quoting *State v. DePew*, 38 Ohio St.3d 275, 288, 528 N.E.2d 542 (1998).

{¶ 55} As we indicated above, in the present case the trial court properly concluded that the evidence of appellant's imprisonment had no probative value and the court properly admonished appellee for eliciting that information. Importantly, the trial court also instructed the jury to disregard this question and answer. Courts must presume that juries follow a court's instructions, including instructions to disregard the testimony. *State v. Treesh,* 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001); *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994); *State v. Zuern*, 32 Ohio St.3d 56, 61, 512 N.E.2d 585 (1987). Further, because the trial court sustained defense counsel's objection, the court prohibited the prosecutor's further pursuit of this issue. Here, in light of the context of the prosecutor's question and the court's curative instruction, we conclude that the trial court did not abuse its discretion and the prosecutor's conduct did not deprive appellant of a fair trial. *See State v. Marr,* 2d Dist. Montgomery No.28604, 2020-Ohio-3898 (prosecutor's eliciting testimony about defendant previously being imprisoned and then reminding the jury of it during closing argument did not affect outcome).

{¶ 56} Second, appellant argues that during closing argument appellee improperly vouched for the victim when the prosecutor referred to the defense as putting "blame on the victim" or "blaming the survivor of this assault." Appellant contends these comments deprived him of a fair trial and warrant a reversal of his conviction.

{¶ 57} "It is improper for a prosecutor to vouch for the credibility of a witness at trial. Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 145. Therefore, "[a]n attorney may not express a personal belief or opinion as to

the credibility of a witness." *Myers* at ¶ 145; *State v. Thacker*, 4th Dist. Lawrence No. 18CA21, 2020-Ohio-4620, ¶ 79. However, "[p]rosecutors are granted wide latitude in closing argument, and the effect of any conduct of the prosecutor during closing argument must be considered in light of the entire case to determine whether the accused was denied a fair trial." *Powell, supra,* ¶ 149.

{¶ 58} In the case sub judice, the trial court appropriately instructed the jury that opening statements and closing statements are not evidence. Further, as noted above, the Supreme Court of Ohio has determined that the prosecution " * * * is entitled to a certain degree of latitude in summation, * * *." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), citing *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561 (1982). By referring to J.L. as a victim or a survivor of sexual assault, as in *Thacker,* no improper vouching occurred because the prosecutor did not express personal belief about the victim's credibility. Rather, the prosecutor responded to defense counsel's attacks on the victim's credibility by commenting on her determination in pursuing the charges and her lack of motive to fabricate them. *Thacker, supra,* at ¶ 81; *see State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 241 (No improper vouching occurred in closing rebuttal because the prosecutor did not express any personal belief about the experts' credibility and "was simply responding to defense attacks by commenting on the experts' collective experience"). Therefore, after our review in the case at bar, we cannot conclude that the prosecution's statements deprived appellant of a fair trial.

{¶ 59} Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error.

V.

{¶ 60} In his fifth assignment of error, appellant asserts that R.C. 2967.271, the "Reagan Tokes Law" as enacted by the Ohio General Assembly, is unconstitutional, and the trial court erred by sentencing appellant under that act. Appellant challenges the Regan Tokes Law as violating both the separation of powers doctrine and due process[2].

{¶ 61} The Reagan Tokes Law, enacted in 2018 and effective on March 22, 2019, requires a court that imposes a prison term under R.C. 2929.14(A)(1)(a) or (2)(a) for a first- or second-degree felony committed on or after March 22, 2019, impose a minimum-maximum prison term determined under R.C. 2929.144(B). R.C. 2929.144(C). A presumption indicates that an offender "shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C. 2967.271(B). A presumptive earned early release date is a date determined under the procedures described in R.C. 2967.27(F), which allow a sentencing court to reduce the minimum prison term under certain circumstances. R.C. 2967.271(A)(2). The Department of Rehabilitation and Correction (DRC) may rebut the presumption if it determines at a hearing that one or more statutorily numerated factors apply. R.C. 2967.271(C). If DRC rebuts the

---

[2] Some of our sister courts have found that Reagan Tokes Law challenges are not ripe for review. *See State v. Maddox,* 6th Dist. Lucas No. CL-19-1253, 2020-Ohio-4702; *State v. Downard,* 5th Dist. Muskingum No. CT2019-0079, 2020-Ohio-4227; *State v. Dames*, 8th Dist Cuyahoga No. 109090, 2020-Ohio-4991. On October 9, 2020, the Sixth District certified a conflict to the Supreme Court of Ohio on the issue of whether the Reagan Tokes Law is ripe for review in a direct appeal, citing the Second and Twelfth Districts as implicitly determining the issue to be ripe for review and finding the law constitutional based on separation of powers and due process. *State v. Velliquette,* 6th Dist. Lucas No. L-19-1232, 2020-Ohio-4855, citing *State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150; *State v. Leet*, 2d Dist. Montgomery No. 28670, 2020-Ohio-4592, *State v. Ferguson,* 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837; *State v. Rogers,* 12th Dist. Butler No. CA2019-11-194, 2020-Ohio-4102, and *State v. Morris*, 12th Dist. Butler No. CA2019-12-205, 2020-Ohio-4103.

presumption, it may maintain the offender's incarceration after the expiration of the minimum prison term or presumptive earned early release date for a reasonable period, determined and specified by DRC, that "shall not exceed the offender's maximum prison term." R.C. 2967.271(D)(1). *See State v. Conant,* 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, ¶ 36.

{¶ 62} The constitutionality of a statute presents a question of law that appellate courts review de novo. *Hayslip v. Hanshaw*, 2016-Ohio-3339, 54 N.E.3d 1272, ¶ 27 (4th Dist.) However, " 'the question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.' " *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15, quoting *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). "We may review the trial court decision for plain error, but we require a showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." (Citation omitted.) *Id.* at ¶ 16. "The burden of demonstrating plain error is on the party asserting it." *Id.* The Supreme Court of Ohio has also "stated that a forfeited constitutional challenge to a statute is subject to review 'where the rights and interests involved may warrant it.' " *Id.*, quoting *In re M.D.,* 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus.

{¶ 63} On August 27, 2020, in *State v. Conant*, 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, this court held that because Conant did not assert a constitutional challenge to the Reagan Tokes Law at the trial level, he forfeited all but plain error. In the case at bar, as in *Conant*, appellant did not raise a constitutional challenge to the Reagan Tokes Law in the trial court and, therefore, forfeited all but plain error. Appellant did not argue plain error in this appeal, and we decline to construct a plain error argument on his behalf, particularly when R.C.

2967.271(C)(1) has not been, and may never be, applied to him. *See State v. Conant, supra,* at ¶ 40.

{¶ 64} Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.

VI.

{¶ 65} In his sixth assignment of error, appellant contends that the cumulative effect of the preceding errors deprived him of his constitutional right to a fair trial.

{¶ 66} Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of error in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), citing *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *State v. Ruble,* 2017-Ohio-7259, 96 N.E.3d 792, ¶ 75 (4th Dist). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith,* 2016-Ohio-5062, 70 N.E.3d 150, ¶ 106 (4th Dist.), citing *State v. Harrington,* 4th Dist. Scioto No. 05CA3038, 2006-Ohio-4388, ¶ 57. In the case sub judice, because we have determined that none of appellant's individual assignments of error have merit, he "cannot establish an entitlement to relief simply by joining those claims together." *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 173; *State v. Thacker, supra,* 2020-Ohio-4620, ¶ 133.

{¶ 67} Accordingly, based upon the foregoing reasons, we overrule appellant's final assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.